UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ADAM BRAY,

     Plaintiff,

     v.                                                    Case No. 3:21-CV-855 JD

KYLE SHIPARSKI, WILLIE
HENDERSON, ADAM BRINKMAN,
MICHIGAN CITY,

     Defendants.

**OPINION AND ORDER**

Following a police informant's tip that Plaintiff Adam Bray was a felon in possession of

a firearm, Defendants Sgt. Kyle Shiparski, Officer Willie Henderson, and Officer Adam

Brinkman conducted a traffic stop resulting in Mr. Bray's arrest. As relevant here, Mr. Bray sued

the three defendants under 42 U.S.C. § 1983 for violation of the Fourth Amendment, alleging

that they used unreasonable force during his arrest. He also sued Defendant Michigan City for

battery under state law. All Defendants moved for summary judgment. (DE 36.) In addition, the

City filed a separate motion for judgment on the pleadings (DE 48). For the reasons below, both

motions will be granted.

### A. Factual Background

After working on October 10, 2019, Mr. Bray walked to the Red Roof Inn in Michigan

City to visit his cousin and his cousin's wife. (Def.'s Fact. Statement, DE 40 ¶ 1.) There he saw

W.S., an acquaintance. (*Id.* ¶ 2–3.) Mr. Bray asked W.S. if he could get a ride home later, and

W.S. agreed.

Unbeknownst to Mr. Bray, W.S. was a police informant, who contacted Sgt. Kyle Shiparski of the Michigan City Police Department ("MCPD"). Sgt. Shiparski had worked with W.S. more than a dozen times and believed that W.S. was credible, reliable, and trustworthy. (*Id.* ¶¶ 4, 12, 13.) W.S. informed him that he was with someone named Bray, who was a felon and who had a handgun. (*Id.* ¶¶ 14–15.) He said they would soon be traveling northbound on Franklin Street in a green Chevy Cobalt. At the time, Sgt. Shiparski was on duty as a member of the LaPorte County Drug Task Force with Cpl. Francisco Rodriguez. They were in an unmarked police car.

As W.S. and Mr. Bray were driving, they were spotted by Sgt. Shiparski. W.S. was changing lanes without using a signal, so Cpl. Rodriguez activated his car's emergency lights and initiated a traffic stop. W.S. pulled over and stopped the car. (*Id.* ¶¶ 24–25.) Multiple officers arrived to assist with the stop, including Defendants Adam Brinkman and Willie Henderson. (*Id.* ¶¶ 27–29.)

Cpl. Rodriguez approached the driver's door and advised W.S. that he was stopped for failure to use the signal before changing lanes. At the same time, Sgt. Shiparski approached the front passenger door to speak to Mr. Bray. (*Id.* ¶¶ 30–31.) Sgt. Shiparski saw a black drawstring bag between Mr. Bray's legs on the floor. Sgt. Shiparski asked Mr. Bray for an identification which he provided. (*Id.* ¶¶ 33–35.) About five minutes into the traffic stop, a canine officer, Sgt. Michael Oberle, arrived with his police dog. (*Id.* ¶ 41.) The dog was trained to detect narcotics, and both Sgt. Oberle and the dog had all their required certifications. (*Id.* ¶ 39.) Sgt. Oberle commanded the dog to search and walked him around the car. As the dog was passing the front passenger door seam, he alerted for the presence of drugs in the car. Sgt. Oberle walked the dog around the car one more time, and the dog alerted at the same spot again. (*Id.* ¶¶ 43–49.)

At this point, Sgt. Shiparski opened the door, told Mr. Bray that the dog alerted for drugs, and ordered him to get out of the car. (*Id.* ¶ 53.) As Mr. Bray was getting out of the car, he turned away from Sgt. Shiparski and Officer Henderson. (*Id.* ¶ 55.) Officer Justin Frever was standing on the other side of the car, near the driver's door. He yelled out that Mr. Bray put something in his mouth.[1] (*Id.* ¶¶ 57–58; Rodriguez bodycam 00:00–00:15; Frever bodycam 06:05–06:12.) On hearing this, Officer Henderson and Sgt. Shiparski grabbed Mr. Bray and ordered him to open his mouth and "spit it out." (Def.'s Fact. Statement ¶ 61, Henderson Bodycam 06:40–07:30.)

From his training and experience as a narcotics detective, Officer Henderson knew that it is common for drug suspects to attempt to swallow illegal narcotics to conceal them from police, which could lead to an accidental overdose or death. (*Id.* ¶¶ 60, 65.) He says he firmly pressed his thumb and index fingers against the bottom of Mr. Bray's jawline to prevent him from swallowing whatever he placed in his mouth. (*Id.* ¶ 63–64.) Mr. Bray claims that at this point Officer Henderson began choking him.[2] (Pl.'s Statement Disputed Facts, DE 44 ¶ 63.) Sgt. Shiparski was also trying to stop Mr. Bray from swallowing. (*Id.* ¶ 64.) As Sgt. Shiparski reached to pull Mr. Bray's lips open, he saw the edge of a clear plastic bag in Mr. Bray's mouth. (*Id.* ¶ 66.) Mr. Bray does not contest that Sgt. Shiparski saw a plastic bag in his mouth. (*See* Pl.'s

---

[1] Defendants also posit in their Statement of Undisputed Material Facts that "[f]rom Ofc. Henderson's bodycam vantage point, it appears that Bray moved his left hand up to his mouth as he is exiting the vehicle. [Henderson bodycam at 06:31–06:38]" (DE 40 ¶ 58.) Although this particular action is not discernable to the Court even after reviewing the video-recording multiple times, Mr. Bray's response, drafted by his counsel, does not dispute this fact. (*See* Pl.'s Statement of Disputed Material Facts, DE 44 ¶ 58.)

[2] Mr. Bray does not explain how long the choking lasted, whether it was a single or repeated occurrence, or how much pressure was applied. It is impossible to tell from the nine bodycam video-recordings submitted by Defendants to what extent, if at all, Defendants were choking Mr. Bray.

Statement of Disputed Material Facts, DE 44 ¶ 66; Shiparski Aff., DE 38-2 ¶ 22.)[3] Nor does he suggest that the officers planted or otherwise manipulated the evidence.

Mr. Bray did not comply with the officers' orders to open his mouth, so they warned him that he would get tased.[4] (*Id.* ¶ 67–68; Richardson Bodycam 5:05–5:13.) As Mr. Bray continued to refuse to open his mouth, Officer Adam Brinkman delivered a drive stun with his taser to Mr. Bray's back.[5] (Richardson Bodycam 5:05–5:13.) After the drive stun shock, Mr. Bray was told another electric shock would be applied unless he opened his mouth. Mr. Bray did not comply, so another drive stun was administered to his back. (Def.'s Fact. Statement, DE 40 ¶¶ 72–73.) The sequence was repeated one more time for a total of three drive stuns being administered. (Brinkman Bodycam 2, 00:00–01:11.) At this point, Sgt. Shiparski managed to pull out two small clear plastic baggies from Mr. Bray's mouth. (Def.'s Fact. Statement, DE 40 ¶ 74; Shiparski Aff., DE 38-2 ¶ 23; Henderson Aff., DE 38-3 ¶11.) The first baggie was open and had a bit of a white powder-like substance. The second one was tied in a knot and had a brown powder-like substance.[6] (Def.'s Fact. Statement, DE 40 ¶ 76; Shiparski Aff., DE 38-2 ¶ 23; Henderson Aff., DE 38-3 ¶11.) The initial struggle—from the moment that Officer Frever said

---

[3] Under Local Rule 56-1(b)(2)(B)–(C), to dispute a fact presented in support of a motion for summary judgment, the opposing party must provide a response to that fact with "a citation to evidence supporting [such a] dispute of fact." No such response is contained in Mr. Bray's filing.

[4] In his Statement of Disputed Material Facts, Mr. Bray stated that "[he] never forcibly resisted officers" (Pl.'s Disputed Material Facts, DE 44 ¶ 67), but does not cite to anything in the record to support his statement.

[5] A drive stun is a way to deliver an electrical shock to an individual without firing the probes from the taser. It is considered a less quantum of force than firing the taser's probes. (Def.'s Fact. Statement, DE 40 ¶ 70.) "In drivestun mode, . . . the officer does not fire probes at the target but instead presses the device's electrodes directly to the target's body and pulls the trigger to deliver the electric current. When utilized in this manner, the [taser] does not override the target's central nervous system. Rather, it becomes a pain compliance tool with limited threat reduction." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 725–26 (7th Cir. 2013) (cleaned up).

[6] The substances field-tested positive for cocaine (0.1g.) and heroin (0.6g).

Mr. Bray put something into his mouth until the baggies were removed—lasted about sixty seconds.

Almost immediately after the baggies were removed, Mr. Bray was pushed to the grass where the officers tried to handcuff him. At first, Mr. Bray was on his back but the officers rolled him on his stomach. About ten seconds after he was rolled over, and as the officers were trying to bring both of his hands behind his back, Mr. Bray said he could not breath. (*Id.* ¶¶ 81–82.) Mr. Bray continued to deny that he put anything in his mouth. The officers continually commanded Mr. Bray to place his hands behind his back. (*Id.* ¶ 84.) Officer Henderson placed his upper body on Mr. Bray's body. Mr. Bray states that this action amounted to him being choked by Officer Henderson. (Pl.'s Statement of Disputed Material Facts, DE 44 ¶ 79.) About thirty seconds elapsed from the moment Mr. Bray was taken to the ground until his hands were in handcuffs. (*Id.* ¶ 86.) At that point, the officers pulled away from Mr. Bray.

Once handcuffed, Officer Henderson repeatedly asked Mr. Bray what he ate while maintaining a grip on his sweatshirt. (*Id.* ¶ 87.) He and other officers said they needed to have this information for his own good in case his stomach needed to be pumped to emit any dangerous substances he may have consumed. This lasted thirty-five seconds. Next, Officer Henderson placed his knee on Mr. Bray's upper back. After seventeen seconds of the knee being placed on his upper back, Mr. Bray said he couldn't breathe; five seconds later, Officer Henderson removed his knee. Shortly after that, the officers momentarily rolled Mr. Bray to his side as they searched through his clothes. (*Id.* ¶ 90.) The officers then stood him up and moved him to be seated on the parking lot pavement.

The officers searched the car, and Lt. Richardson found a firearm in the drawstring bag. (*Id.* ¶ 95.) Mr. Bray was charged in state court with a firearms offense arising out of the discovery of the gun to which he pleaded guilty.

**B.      Legal Standard**

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may be granted only if no reasonable jury could decide for the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). There must be more than a mere scintilla of evidence in support of the opposing party's position and "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009); *Anderson*, 477 U.S. at 252. Instead, the opposing party must have "evidence on which the jury could reasonably find" in his or her favor. *Anderson*, 477 U.S. at 252. "Although facts and

reasonable inferences are normally drawn in favor of nonmovant, when video footage or audio recordings clearly contradict a nonmovant's claims, courts consider the video and audio evidence without favoring the nonmovant." *Agnew v. Cater*, 2022 U.S. Dist. LEXIS 31604, *17-18 (N.D. Ill., Feb. 23, 2022) (citing *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) and *Scott v. Harris*, 550 U.S. 372 (2007)).

> Video evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts. *Scott*, 550 U.S. at 380. It is a "narrow, pragmatic exception allowing appellants to contest the district court's determination that material facts are genuinely disputed," but only where the video "utterly discredit[s]" the non-movant's version of the facts. *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019). *Gant* further explained that:
>
> > *Scott* does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers some support for a governmental officer's version of events. Instead, *Scott* holds that where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review.
>
> *Id*. at 450 (internal citations omitted). It should be considered a rare case where video evidence leaves no room for interpretation by a fact finder. *Id*.

*Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023).

> Rule 56(c) requires that the asserted facts be supported by citations to the record:
>
> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The Court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Local Rule 56-1 further specifies that a party opposing the motion for summary judgment must respond to the movant's statement of material facts and set forth any other facts for the Court's consideration:

> A party opposing the motion must . . . separately file:
>
> (1) A response brief; and
>
> (2) a Response to Statement of Material Facts which includes:
>
> > (A) a verbatim restatement of the Statement of Material Facts;
> >
> > (B) a correspondingly numbered response immediately following each paragraph of the Statement of Material Facts;
> >
> > (C) a citation to evidence supporting each dispute of fact; and
> >
> > (D) additional facts in a section titled Additional Material Facts with numbered paragraphs continuing the sequential numbering of the Statement of Material Facts for each additional material fact the opposing party contends is undisputed which includes:
> >
> > > (i) a short statement of each fact; and
> > >
> > > (ii) a citation to evidence supporting each fact.

## C.    Discussion

### (1) *Section 1983 Claim*

In Count 1 of his complaint, Mr. Bray claims that Sgt. Shiparski, Officer Henderson, and Officer Brinkman violated his Fourth Amendment rights by using excessive force during his arrest. According to the complaint, when Mr. Bray got out of the car, he was not forcibly resisting Defendants as they restrained him, yet they began choking and drive-stunning him and then threw him to the ground where he was handcuffed. (Compl., DE 4 ¶¶23–29.) In their motion

for summary judgment, Defendants argue that their actions are shielded by the doctrine of

qualified immunity. They submit that they were reacting to Mr. Bray placing in his mouth what

they believed was contraband and that the force used was reasonably necessary to protect his

welfare and to preserve evidence of a crime. They also insist that Mr. Bray has not shown that

they violated his clearly established constitutional rights.

Defendants also argue extensively about the legitimacy of the traffic stop, using a

narcotics dog, and ultimately the arrest itself. They explain that they were justified to stop the car

in which Mr. Bray was driving upon reasonable suspicion that Mr. Bray was violating the law by

possessing a firearm as a felon, *see Heien v. N. Carolina*, 135 S.Ct. 530, 536 (2014), and *Terry v.

Ohio*, 392 U.S. 1 (1968), and upon witnessing the driver of the car switch lanes without proper

signaling, *see Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014). Similarly, Defendants set out

the law regarding "free air sniffs" by drug-detecting dogs to show that no violation took place

when Officer Oberle commanded his dog to search for narcotics. *See United States v. Place*, 462

U.S. 696, 707 (1983) ("[W]e conclude that the particular course of investigation that the agents

intended to pursue here—exposure of respondent's luggage, which was located in a public place,

to a trained canine—did not constitute a 'search' within the meaning of the Fourth

Amendment."). Finally, Defendants argue that, following the dog's alert for drugs in the car,

coupled with a reliable informant's tip that Mr. Bray was a felon in possession of a firearm, they

had probable cause to arrest Mr. Bray. *See Devenpeck v. Alford*, 543 U.S. 146, 152 ("[A]

warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is

probable cause to believe that a criminal offense has been or is being committed."). They also

rely on *Heck v. Humphrey*, 512 U.S. 477 (1994), in their defense against any claim that Mr. Bray

was arrested in violation of the Fourth Amendment.

But none of these claims appear in Mr. Bray's complaint. And to the extent that they can be reasonably inferred, they have been waived by Mr. Bray since he has failed to respond to any of these arguments. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument raised on summary judgment waives the argument and abandons the claim."); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions."). With these claims set aside, all that remains under the § 1983 umbrella is Mr. Bray's claim that Defendants used excessive force when arresting him.

As noted already, Defendants invoke qualified immunity. "Qualified immunity shields a government official from liability for damages when the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (quotation marks and citation omitted). "Courts use a two-part test to determine whether officers are entitled to qualified immunity: (1) whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and (2) whether that right was clearly established at the time the conduct occurred." *Id.* (quotations and citation omitted).

Courts may address the two prongs of qualified immunity in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In addition, the Seventh Circuit recently emphasized to "think hard, and then think hard again, before addressing both qualified immunity and the merits

of an underlying constitutional claim." *McGee v. Parsano*, 55 F.4th 563, 572 (7th Cir. 2022) (quotations omitted) (quoting *Dist. Of Columbia v. Wesby*, 138 S. Ct. 577 n.7 (2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)). The courts must balance the need for deciding the difficult Constitutional issues with the general principle of judicial restraint, especially when briefs or the record lack clarity. *Cf. Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 584 (1947) (acknowledging the principle of avoiding constitutional questions unless they are presented "in clean-cut and concrete form").

It is the plaintiff's burden to show that the constitutional right was clearly established. *Landstrom v. Ill. Dep't of Child. & Fam. Servs.*, 892 F.2d 670, 676 (7th Cir. 1990). He can do this in one of two ways: by pointing to precedent clearly establishing the constitutional right; or by "showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) ("In some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated.").

"To determine whether a right is clearly established, we look first to controlling Supreme Court precedent and our own circuit decisions on the issue. In the absence of controlling precedent, we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Jacobs*, 215 F.3d at 767 (7th Cir. 2000) (quoting *Cleveland–Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)).

"Although the plaintiff need not point to a case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Vill. of Arlington Heights*, 782 F.3d at 915 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). "In other words, the plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right. *Id*. If the plaintiff fails to make such a showing, the defendant will prevail. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).

"[T]he Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *McGee v. Parsano*, 55 F.4th at 572–73 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (cleaned up). The inverse is also true: "just as defining a right too broadly may defeat the purpose of qualified immunity, defining a right too narrowly may defeat the purpose of § 1983." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 732 (7th Cir. 2013.) So, the plaintiff need not put forward a case that is "on all fours" with the facts and law in the plaintiff's case. *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957–58 (7th Cir. 1997) (internal citations and quotations omitted). "Instead, 'closely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established.'" *Id*. at 958 (quoting *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988)).

In response to Defendants' motion for summary judgment, Mr. Bray argues that "there is a genuine dispute of whether the Defendant Officers used reasonable force when they apprehended Mr. Bray." (Pl.'s Resp., DE 43 at 3.) It's not clear whether he means factual dispute, legal dispute, or both, but it does not matter: Mr. Bray has not overcome Defendant's

12

qualified immunity defense because he has not pointed to an analogous case where a Fourth Amendment violation was found, nor has he argued that the "violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue." *Brokaw v. Mercer Cnty.*, 235 F.3d at 1022. In fact, apart from glossing over his burden to overcome the qualified immunity, Mr. Bray has done little else to develop an argument to defeat that defense. It's best here to address each discrete use of force separately: the alleged choking and the force used from the moment Mr. Bray was pushed to the ground until secured. Therefore, the Court will break up its discussion into two parts. *Cf. Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage.").

(a) *Removing the Baggies from Mr. Bray's Mouth*

The Court believes that the question related to the initial use of force can—and should— be resolved by addressing only the second prong of the qualified immunity analysis. Taking as true Mr. Bray's representation that he was choked when the officers were trying to remove the baggies from his mouth (the video does not dispositively show he was not), the first prong presents a complicated constitutional issue: whether such force was reasonable when used to prevent a drug overdose, or even death, and the destruction of evidence. Mr. Bray's brief does not address this question.

Instead, he has reduced this incident to the several seconds that it took him to step out of the car as ordered by the officers, and, on that basis, he insists that the officers' use of force was unreasonable. Mr. Bray ignores the uncontested evidence that he placed drugs in his mouth while getting out of the car. In opposing a motion for summary judgment, Mr. Bray may not rely on

allegations or denials in his own pleadings but must present evidence he believes will prove his case. *See Goodman*, 621 F.3d at 654. Under Rule 56(c)(1), Mr. Bray needed to support his assertions "by citing to particular parts of materials in the record" or by showing that Defendants "cannot produce admissible evidence to support the fact." Similarly, under Local Rule 56-1, if Mr. Bray was disputing Defendants facts, he had to identify such facts and provide "a citation to evidence supporting [such] dispute of fact." Thus, the Defendants' contentions that Officer Frever saw Mr. Bray put something in his mouth, that Mr. Bray refused to open his mouth and spit out the objects, that Sgt. Shiparski managed to pull out two small clear plastic baggies from his mouth, and that the baggies—one of which was open—contained cocaine and heroin all stand uncontradicted in Mr. Bray's Statement of Disputed Material Facts. (*See* DE 44 ¶¶ 44, 58, 61–62, 74–75.) While Mr. Bray disputes (without citation to the record) Defendants' claim in paragraph 67 of their Statement of Undisputed Material Facts that he resisted the officers during the struggle to remove the baggies from his mouth, he does not dispute that he did not comply with their commands to "spit it out and open his mouth." (*See* DE 44 ¶ 67.)

In short, the Court is left with doing Mr. Bray's work to determine the constitutionality of Defendants' actions. Having thought hard and again, the Court is unwilling to cast judgment in light of such a meager record. This is not the case of a plaintiff proceeding pro se where allowing the parties a second round of briefings may help in deciding the issue. Moreover, as discussed below, Mr. Bray has failed his burden as to the second prong of the qualified immunity test, so any attempt to supplement the record would be futile.[7]

---

[7] In their opening brief, Defendants argued extensively for summary judgment on any claim of failure to intervene. In his response, Mr. Bray does not touch on this issue at all thus waiving it. *See Johnson*, 733 F.3d at (arguments not raised in opposition to a motion for summary judgment are waived).

This brings the Court to the second prong of the qualified immunity test. "Even when a public official's actions have violated a plaintiff's constitutional rights, the official can escape liability if the right was not clearly established at the time of the violation." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). "Importantly, the plaintiff must show that the right is clearly established such that 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violated that right.'" *Id.* (quoting *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). Mr. Bray has not carried that burden, nor even attempted to do so.

As discussed above, in opposing Defendants' qualified immunity defense, Mr. Bray only argues that there is a genuine issue of material fact whether the officers used reasonable force. However, he has presented no argument to explain how the officers' force was so plainly excessive as to defeat a qualified immunity defense.

Citing *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013), Mr. Bray relies on a general proposition that "it is well established that police officers could not use significant force on nonresisting or passively resisting suspects." (Pl.'s Resp., DE 43 at 5) But this proposition is too general to overcome qualified immunity.[8] *Cf. Findlay*, 722 F.3d at 900 (". . . *Gray* notes only that the 'right to be free from unreasonable seizure was a clearly established right.' But qualified immunity requires the plaintiff to produce a case clearly establishing the right in a particularize sense, rather than in an abstract or general sense. That broad statement is not sufficiently particularized to the facts [plaintiff] alleges and does not satisfy [plaintiff's]

---

[8] Arguably, Mr. Bray's lack of focus on his burden and failure to develop an argument in response to the officers' defense operates as a waiver of his claim. *See Varner v. Ill. State Univ.*, 226 F.3d 927, 936–37 (7th Cir. 2000) (undeveloped arguments are waived "even where these arguments raise constitutional issues") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).

burden of showing a violation of clearly established law.") (quotation marks and case citations omitted)). Simply put, *Abbott* is not the case that put Defendants on notice that they were violating Mr. Bray's clearly established constitutional rights. In *Abbott*, Cindy Abbott's adult son threatened animal control officers who called the police. After the officers arrived, the son went inside the house and refused to talk to them. Cindy came home and asked the son to come out, who was then arrested and placed in the defendant's squad car. As the defendant was backing out to leave, he hit Cindy's car, agitating her. She began walking toward her vehicle and the squad car to inspect the damage and was screaming, "I can't believe you hit my vehicle!" Meanwhile the son in the squad car tried to get out. The defendant got out of the car, held up his hand and twice ordered Cindy to stop, but she continued on toward the vehicles. The defendant then shot her in the abdomen with his taser, causing her to fall to the ground and remain motionless. The defendant came closer to her and yelled for her to roll over onto her stomach. After she failed to move, the defendant hit her with another jolt of electricity, rolled her over and handcuffed her. *Id.* at 710–11. The Court of Appeals for the Seventh Circuit held that the defendant's action of jolting Cindy while she was motionless on the ground was not protected by qualified immunity:

> we conclude that it was clearly established [at the time of the incident] that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over. Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects.

*Id*. at 732. But *Abbott* is not factually similar to what happened here. Cindy was lying motionless on the ground when the defendant jolted her with the taser. She was not suspected of possessing narcotics and she put nothing in her mouth, so as to possibly endanger herself. In fact, nothing about *Abbott* would have given notice to Defendants here that they were violating Mr. Bray's constitutional rights by attempting to remove objects from his mouth, under suspicion that he

was hiding illegal drugs, which could have resulted in an accidental overdose, or even death, and the destruction of evidence of a crime, where he was not compliant with the direction to spit out the substances.

Mr. Bray relies on one other case to defeat Defendants' claim of qualified immunity, *Morfin v. City of E. Chicago*, 349 F.3d 989, 999 (7th Cir. 2003), which is just as unhelpful. In *Morfin*, the plaintiff was a voting machine mechanic and a political supporter of a challenger to an incumbent mayor's re-election campaign. On election day, the plaintiff was called to check on a voting machine at a polling site. On summary judgment, the parties' accounts differed on what happened next. The plaintiff maintained that when he arrived, a police officer was dusting the machine for fingerprints. The plaintiff asked to examine the machine, and his request ultimately turned into a conflict between him and the mayor's son. The mayor's son wanted the plaintiff removed. When the plaintiff refused to leave, he was arrested by the defendant police officers. During the arrest, he was docile and cooperative. Despite that, the officers grabbed him, twisted his arm, shoved him toward the wall and took him to the floor after which he crossed his arms on his chest to avoid being handcuffed. *Id*. at 1005. On the other hand, the defendants insisted that the plaintiff was interfering with their crime scene investigation, was belligerent, and resisted being handcuffed. The trial court accepted the defendants' version and granted summary judgment for them on the plaintiff's excessive force claim. The Seventh Circuit reversed, finding there was a genuine dispute of material fact as to whether the defendants used excessive force against the plaintiff. *Id*.

To the extent that Mr. Bray is arguing that the Court may not grant Defendants' motion for summary judgment because there are genuine issues of material fact, as explained above, he did not dispute Defendants' statement of facts except regarding the allegation of choking, which

17

the Court accepts for purposes of its analysis. And to the extent that Mr. Bray is relying on *Morfin* to show that it's a precedent clearly establishing the constitutional right against the officers removing suspected contraband from his mouth, the two cases have nothing in common. Mr. Bray has identified no case even generally on point in the Seventh Circuit, or any other circuit, that places the constitutional question of whether Defendants applied reasonable force beyond debate. *Cf. Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) ("In ascertaining whether a right is clearly established, this court looks to controlling Supreme Court and 7th Circuit precedent."). Nor could the Court find such a case on its own. The Court even reviewed cases outside the Seventh Circuit but they do not help Mr. Bray. *See e.g.*, *German v. Sosa*, 399 F. App'x 554, 557 (11th Cir. 2010) ("It is constitutional for officers recognizing an attempt to swallow and destroy what appears to be narcotics to hold the suspect's throat and attempt to pry open the suspect's mouth by placing pressure against his jaw and nose." (citing *Espinoza v. United States*, 278 F.2d 802, 804 (5th Cir. 1960)); *Johnson v. Rogers*, No. 3:10-CV-50-WKW, 2012 WL 3231327, at *8 (M.D. Ala. July 11, 2012), report and recommendation adopted sub nom. *Johnson v. Rodgers*, No. 3:10-CV-50-WKW, 2012 WL 3206238 (M.D. Ala. Aug. 6, 2012) ("Under the tense and rapidly evolving situation confronting Defendants, the court finds that Defendant [] did not use excessive force when he put Plaintiff in a chokehold to prevent him from swallowing the drugs suspected to be in his mouth as it does not violate any clearly established right for law enforcement officers, who reasonably believe a suspect is attempting to swallow and/or destroy drug evidence, to use reasonable force to prevent such occurrence, including holding the suspect's throat and/or attempting to pry open the suspect's mouth by placing pressure against his/her jaw and nose."); *Ellis v. Columbus Police Dep't*, No. 1:07CV124-A-A, 2009 WL 1663454, at *6 (N.D. Miss. June 15, 2009) ("If a suspect attempts to

swallow evidence, law enforcement officers may hold his throat and pinch his nose shut in an attempt to retrieve the evidence.").

The final question here is whether Defendants' conduct was such that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue. Mr. Bray spent no time on this subject, thus waiving any argument he may have had.[9] Regardless, given the cases cited above, this is not the rare situation of an obvious violation. *Cf. District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) ("Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."). Defendants were following up on a tip from a reliable informant that his passenger, whom they did not know, was a felon in possession of a firearm. After stopping the car, they were alerted by a drug dog to the presence of drugs in the car. Seconds later, as Mr. Bray was getting out of the car, an officer saw him put something in his mouth. Defendants simultaneously grabbed and began commanding him to open his mouth and spit out the item. As seen in the video recordings, the force was applied only to the extent to prevent Mr. Bray from swallowing what the officers believed were drugs (which turned out to be true). Mr. Bray was attempting to hide evidence, but even worse, was subjecting himself to a potential overdose or death. In considering these difficult circumstances, the Court cannot say that the officers should have known of the unconstitutionality of their conduct.

As for Officer Brinkman, Mr. Bray was warned multiple times that he would be tased if he did not spit out whatever he had in his mouth. Only then did Officer Brinkman tase him, and

---

[9] Generally, undeveloped arguments are considered to be waived, *see Wehrs v. Wells*, 688 F.3d 886, 891 n.2 (7th Cir. 2012) (undeveloped and unsupported arguments are considered waived); *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) ("An undeveloped argument constitutes waiver. A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point.").

although he was tased three times, he was warned beforehand each time. As with the issue of choking, Mr. Bray did not present—or to be more accurate, did not even try to present—any analogous cases showing a constitutional violation under similar circumstances and did not argue that the use of the taser was an obvious violation of the Fourth Amendment. Without such a showing, Defendants must prevail. *See also Love v. Rockford Ill. Mun. Police Dep't*, No. 08 C 50254, 2013 WL 159246, at *2 (N.D. Ill. Jan. 15, 2013) ("Accordingly, the court finds that neither the strike to the mouth nor the taser under these circumstances was excessive as a matter of law and that Wassner is entitled to summary judgment on the Fourth Amendment claim in Count I."); *Pennington v. Terry*, 644 Fed. Appx. 533, 544 (6th Cir. 2016) ("[A]n examination of controlling and persuasive case law demonstrates that it was not clearly established as of March 2, 2012 that using a Taser [in order to prevent a potential drug overdose and to preserve evidence] violated the Fourth Amendment."). "[J]ust as a district court is not required to scour the record looking for a factual dispute, it is not required to scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

(b) *Mr. Bray's Handcuffing*

Next, the Court will consider the handcuffing of Mr. Bray. Here, Mr. Bray's claim fails from the start of the qualified immunity analysis, that is, he has not shown that the officers' conduct violated his constitutional rights. Mr. Bray suggests that Defendants used unreasonable force, but, as before, his argument is bare bones. In fact, while the Court could at least discern his attempt to argue the qualified immunity issue in relation to the removal of the items from his mouth, the same cannot be said about the rest of the incident. Mr. Bray submits that Officer

Henderson used unreasonable force by choking him when he was on the ground by placing his upper body on top of Mr. Bray's upper body, even though Mr. Bray was "under control [of Defendants]." (Pl.s Resp., DE 43 at 3.) The Court disagrees.[10]

The Supreme Court has long "recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them." *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002). And "[u]nlike when someone is passively refusing to move or follow lawful commands, the police may use significant force to subdue someone who is actively resisting lawful detention." *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) (citing cases). Indeed, "police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009).

That's what happened here. Mr. Bray refused to comply with Defendants' commands to open his mouth or spit out the item. After a sixty-second struggle, Sgt. Shiparkski managed to remove two baggies, and immediately Officer Henderson pushed Mr. Bray to the ground where he, Officer Brinkman, and several other officers tried to handcuff him. At first Mr. Bray was on his back, but within seconds the officers rolled him on his stomach, ostensibly to prevent ingestion of any item remaining in his mouth. From there they tried to bring his hands behind his back with Officer Henderson placing his upper body upon Mr. Bray's upper body. About ten

---

[10] The Court must note again that, by failing to develop his argument, Mr. Bray has waived it. *See United States v. Alden*. 527 F.3d 653, 654 (perfunctory and undeveloped arguments are waived even when they raise constitutional issues and it is not the court's obligation to research and construct the legal issues available to the parties).

seconds later, Mr. Bray said he could not breath and it took another twenty seconds for the handcuffs to be applied at which point the officers pulled away from Mr. Bray. In all, 30 seconds elapsed from when Mr. Bray was placed on the ground until he was handcuffed.[11] Under the circumstances, the Court finds that the officers' use of force was reasonable. Everything happened in a rapid succession as seen in the video-recordings, and at no point until the handcuffs were applied would a reasonable officer have been assured that Mr. Bray's struggle was over. Moreover, given the information that Mr. Bray was a felon in possession of a weapon, extra force in weighing him down was justified to make sure he could not grab a gun if it was on his body. The need for this force is all the more true because, just moments earlier, it took three stun drive jolts to remove the baggies from his mouth. *Cf. Radjen v. Parrish*, 2009 U.S. Dist. LEXIS 86997, 2009 WL 3060206, at *9 (N.D. Ind. 2009) (no excessive force used when officer threw suspect against trunk of patrol car because reasonable officer would have thought suspect was continuing to struggle and that officer needed to gain physical control over suspect). The Seventh Circuit has consistently provided police officers discretion and leeway when using force while arresting suspects in unpredictable situations like the one that confronted the officers here. *See Dockery v. Blackburn*, 911 F.3d 458, 468 (7th Cir. 2018) (discussing a need for margin of error in arrest procedures); *Johnson v. Rogers*, 944 F.3d 966 (7th Cir. 2019) ("Johnson was not under control when [the officer used force to unbalance Johnson]. [That force] must also be understood as an attempt to regain control. That such an attempt causes injury, perhaps because poorly executed, does not lead to liability."); *Findlay v. Lendermon*, 722 F.3d 895 (7th Cir. 2013) (qualified immunity protected defendant officer who tackled the suspect in order to arrest him). In short, Mr. Bray has failed to present any evidence from which a reasonable jury could

---

[11] Sgt. Shiparski was not involved in this use of force; only Defendants Brinkman and Henderson.

conclude that the officers used excessive force in arresting him and thus failed to establish the first prong of the qualified immunity test. As a result, Defendants cannot be found liable. Having decided that Defendants' conduct in handcuffing Mr. Bray did not violate the Fourth Amendment, the Court need not analyze the second prong of the qualified immunity defense.

### (2) *Mr. Bray's Claim against Michigan City*

Mr. Bray asserts a state-law battery claim against Michigan City. After moving for summary judgment, Defendants filed a separate motion seeking judgment on the pleading as to this claim. In their motion, Defendants point out that claims against political subdivisions or their employees are barred unless written notice is filed with the governing body of the entity within 180 days "after the loss occurs." Ind. Code § 34-13-3-8; *Stone v. Wright*, 133 N.E.3d 210, 216 (Ind. Ct. App. 2019). "Loss" is defined in the statute as injury to a person or damage to property. Ind. Code § 34-6-2-75. The notice must be delivered in person or sent by registered or certified mail. Ind. Code § 34-13-3-12. Michigan City is a political subdivision entitled to notice of tort claims. Ind. Code § 34-6-2-110.

A timely tort claim notice isn't just a technical or procedural requirement; it's jurisdictional. "Failure to give a timely notice of claim results in a jurisdictional bar to [Mr. Bray's] action." *Teague v. Boone*, 442 N.E.2d 1119, 1120 (Ind. Ct. App. 1982). Once a defendant raises the plaintiff's failure to comply with the ITCA's notice provisions, the burden shifts to the plaintiff to prove compliance. *Stone*, 133 N.E.3d at 217.

In its motion for judgment on the pleadings, Michigan City points out that Mr. Bray's loss occurred on October 10, 2019. The 180-day period therefore ended on April 7, 2020, but Mr. Bray did not serve his tort claim notice on the City until it was received via certified mail on

April 13, 2020—six days late. In fact, the date on Mr. Bray's tort claim notice itself says April 10, 2020—already three days after the 180-day period expired. Thus, Michigan City argues that Mr. Bray's tort claim notice was untimely.

Although, with the filing of the motion, the burden shifted to Mr. Bray to prove compliance, *see Stone*, 133 N.E.3d at 217, the motion is unopposed because Mr. Bray did not respond. Accordingly, Mr. Bray has effectively abandoned the battery claim against Michigan City, and the Court will grant the motion for judgment on the pleadings. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 n. 1, 721 (7th Cir. 2011) (forfeiture occurs where the "litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ( "Failure to respond to an argument [in a motion to dismiss]—as the [plaintiffs] have done here-results in waiver."); N.D. Ind. L.R. 7-1(d)(5) ("The court may rule on a motion summarily if an opposing party does not file a response before the deadline.").

**D.    Conclusion**

For these reasons, the Court GRANTS Defendants Sgt. Kyle Shiparski, Officer Willie Henderson, and Officer Adam Brinkman's motion for summary judgment (DE 36); and GRANTS Defendant Michigan City's motion for judgment on the pleadings (DE 48).

SO ORDERED.

ENTERED: April 30, 2024

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court